16 U.S. 392
 3 Wheat. 392
 4 L.Ed. 418
 The AEOLUS—Wood, Claimant.
 February 27, 1818
 
 APPEAL from the circuit court for the district of Massachusetts.
 This vessel and cargo were libelled in the district Court for the District of Maine, as forfeited to the United States, for lading on board at Liverpool, in Great Britain, certain goods which were of the growth, produce, and manufacture of Great Britain, with intent to import the same into the United States, and with the knowledge of the master, and also for an actual importation of the same into the United States. The seizure was made at Bass Harbour, in the district of Frenchman's Bay, by Meletiah Jordan, collector of that district.
 A petition was interposed by Joseph T. Wood, of Wiscasset, who styled himself agent of Peter Molus and Israel Rosnel, both of Bjornburgh, in Finland in Russia and also of Frantz Scholtz, of Archangel, in Russia, merchants, and subjects of the Emperor of Russia. The petition stated that Molus, Rosnel, and Scholtz were owners of the brig and cargo; that she sailed from Liverpool in the beginning of December, 1813, with a cargo bound to the Havanna, with liberty and instructions to touch at some port in North America, to ascertain whether, according to existing laws, they could be admitted to an entry, and if not, to receive such orders as the agent of the owners might give. That after a long passage of 76 days' and experiencing severe weather, and the vessel being in a leaky condition, and the provisions growing short, she was compelled to make Bass-Harbour. That there was some expectation at Liverpool, when the AEolus sailed, that a treaty of peace between the United States and Great Britain had been concluded, or was in great forwardness. The petition prayed that the vessel and cargo might be restored to Mr. Wood, on his giving bail for the appraised value. This claim was filed the 14th of February, 1814. At the May term following, Molus & Rosnell claim the brig as their property, and Scholtz claims the cargo as belonging to himself.
 In February term, 1815, a rule was made on claimants to produce the log-book at the trial, and an original letter to J. T. Wood, mentioned in the deposition of the supercargo.
 Montero, mate of the brig, swore that she sailed direct from Liverpool to the United States. The captain on the passage told him that the vessel was bound to the United States. The captain and supercargo said it was their intention to have gone to Wiscasset, or Portland, where they were to discharge, but owing to the bad state of their rigging, and the wind being ahead, they put into Mount Desert, where they were detained by the custom-house officer. He also states, that it was agreed, in Liverpool, with all the sailors, himself and the cook excepted, that they should come to the United States, and return from thence to Liverpool. About three months after, the mate was examined again, when he told a story so different from the relation which is found in his first deposition, that but little credit is due to him as a witness for either party.
 Lingman, one of the mariners of the AEolus, swore, that he was shipped on board that vessel in October last, she then lying in Liverpool, on a voyage to some port in America, and from thence back to some port in Europe.
 Daniel Molus, master of the AEolus, testified, that in October, 1813, he came to Liverpool, from Bjornburg in the Brig AEolus. One Lourande, who was master of the brig, having a power to charter her as he might think proper, did charter her to Frantz Scholtz, of Archangel, by his agent, David Morgan, on a voyage to the Havanna, and a port in North or South America. He was ordered by Morgan, the agent of Scholtz, to proceed with the brig to the Havanna, and call off such ports as the supercargo should direct. On the 4th of December, 1813, the brig left Liverpool. Two days after, he was ordered by the supercargo to proceed off the part of Wiscasset, and land some passengers, when he would receive further orders from the supercargo, who expected to find further orders there. On their passage, the brig had thirteen of her chains broken, some of them in the eye round the bolt, and therefore could not be repaired until some of the cargo was discharged. Five of her shrouds were carried away, the bolts in the heel of her bowsprit were broken, and the bowsprit came some in upon deck. The stern boat was, by a sea, stove in pieces at the stern and lost, with several light sails which had been thown into her. The spritsail yard was lost; her waist-rails and boards were wholly carried away by the sea. The binnacle was several times capsized, and the compasses very much injured. One of the passengers was lost overboard. The brig was short of water; and at the time of her arrival on the American coast, the crew was in very great distress, being on a short allowance of water, which was very thick and bad, and not fit to be used until it was boiled, to make it thin. There was no rigging to repair the vessel any longer. On the 17th of February, 1814, a council of the whole ship's crew and passengers was held, and all were of opinion it was very dangerous keeping longer at sea, and were for getting into the first port which could be made. The supercargo reluctantly consented. If he had not, the brig must have gone in, as her condition would have justified the act. In the afternoon of the 18th of February, 1814, the AEolus anchored in Bass-Harbour, after a passage of 75 days, in which every hardship had been experienced. The vessel was a complete wreck, and the strength and spirit of the crew nearly exhausted. She was immediately seized by the custom-house officer, and the papers all delivered up. Shortly after, the supercargo received advice from his agent, who soon came on board himself. This witness speaks of a survey of three ship-masters, and of their opinion; but as no such survey is found in the proceedings, it is presumed that none was made; or, if made, reduced to writing. He further states, that the brig had been repaired while at Bass-Harbour, at an expense of near 3,000 dollars. The cargo was the sole property of Mr. Scholtz, of Archangel, and was put on board by his agent, David Morgan, of London, who employed Richards, Ogden, & Selden, as brokers for that purpose.
 Frederic Williams testifies that he was supercargo; that the brig was Russian—expected in England that the non-importation law would soon be repealed. His orders were to proceed to Havanna, and to call off Wiscasset, where he would receive orders from Joseph Wood, agent of Mr. Scholtz, and if restrictions were removed, to enter with the brig; if otherwise, to proceed to the Havanna; had much tempestuous weather, carried away most of their chains, and many of the shrouds. On the arrival of the brig at Bass-Harbour, he wrote to Wood that the brig had been seized, and consulting him what had best be done. He gave up his papers to the deputy-marshall, and took a receipt for them. Wood wrote to him, and also came down to the brig himself, and informed him that the vessel had been seized for an alleged violation of the non-importation law. He received his instructions as supercargo from Morgan, the agent of Scholtz, in London, and they were verbal instructions only. He did not recollect that he had ever received any letter, either from Morgan or Scholtz, concerning this voyage. He is a native of Massachusetts, but had not resided in the United States for about four years previous to the commencement of this voyage. Since the arrival of the AEolus, he has resided nearly two years in New-York. All the papers he had were receipts from the cartmen in Liverpool, and they were bundled together in the cabin, from which place he took them and delivered them to Wood, who, he presumes, has them.
 It appears by the testimony of Robert Kelly, that Wood informed him, in the beginning of February, 1814, that he expected a brig from the West Indies, and a Russian brig to call off the mouth of Sheepscot river for orders, and to know whether they can enter. He desires Kelly, by letters which are produced, to keep a good look out for these vessels, to direct the one from the West Indies to proceed to Newport, and to inform the captain or supercargo of the Russian brig, that the laws will not admit of his entering, unless he is in want of something, in which case he may put into the mouth of the river. Kelly cruized off the mouth of the river for about four weeks, when he heard from Wood, that the Russian vessel had put into Mount Desert, and was seized.
 Thomas Rice relates a conversation which he overheard, between Wood and a Mr. Pepper, in which the former offered the latter a handsome present to swear that he had been offered money by Haddock and Jordon, to give testimony against the brig, and in which Wood also stated that he had offered the mate money, to contradict the testimony he had given for Jordan.
 John Bridges swears, that, being in Liverpool, in November, 1813, with six other Americans, they were applied to by Mr. Richards, of the house of Ogden, Richards, & Selden, who offered to find them clothes, to pay their board while at Liverpool, and to find them a passage to America. He accordingly supplied them with clothes, paid their board eight weeks, and then put them on board the Russian brig AEolus, in which they sailed for Portland.
 Samuel Haddock, jun. an inspector of the customs, went on board of the brig when she came into Bass-Harbour, and demanded her papers of the supercargo, which he refused to give up, as he was determined to proceed further to the westward. He understood from the mate, that the supercargo had taken the bills of the cargo from him, and burnt them. He thinks the brig might have proceeded on her voyage to the Havanna, when she came into Bass-Harbour, with such repairs as might have been made on board. None of the officers complained or intimated to him, that the brig had come into Bass-Harbour in distress, nor did they pretend that the cargo was damaged, until they began to break bulk.
 By another witness, it appears that, after the seizure, the master of the AEolus, in company with the mate, purchased of him a chart of the Amelia islands, Havannah, and the coast adjacent, observing that he had no idea of going such a voyage when he left England, or he should have provided himself with one.
 Abraham Richardson was put on board the brig as an inspector of the customs, when she was seized, and continued on board till the cargo was discharged, which was about 25 days. He overheard a conversation between Wood and the supercargo in the stateroom of the latter, in which Wood expressed a wish that the brig had got to Wiscasset, as he had told the collector at that place that the brig was coming, and that he had offered him 10,000 if he would let her enter. He observed that the collector did not tell him whether he would, but he believed that if the vessel had put in there they would have got her off very easy. The supercargo observed to Wood, that if it was known that he, Wood, was concerned in the voyage it would condemn vessel and cargo. Wood replied, 'You must be very careful not to drop a word about it. We must make it out Russian property, if we can.' The supercargo then remarked, that if the collector would not clear out the brig for Wiscasset, they must make her out as bad as possible, so that she could not be moved, and then bond the cargo; upon which Wood observed, that if it was condemned they should then make a good voyage, as the bonds would not be much more than the double duties. This witness heard no complaints on board of any distress, and believes the AEoulus might have proceeded to the West Indies.
 The papers on board represented the vessel and cargo as Russian property. On this testimony the property was condemned as forfeited to the United States, from which sentence the claimants appealed to this court.
 Feb. 18th.
 Mr. D. B. Ogden, and Mr. Wheaton, for the appellants and claimants, argued upon the facts, that the cargo was not put on board with intent to import the same into the United States, but that the primary destination was to the Havanna, with orders to call off the coast of this country, and to enter, in case the non-importation laws should be repealed. But even if the fact were ever so well established, that the cargo was originally put on board with intent to import it into the United States, congress could not, consistently with the principles of universal law, forfeit the property of foreigners for an act done by them in a foreign port. The putting on board the prohibited commodities with intention to import, is made a distinct, substantive offence, by the 5th section of the act of the 1st of March, 1809, ch. 195. This offence was consummated within a foreign territory. If the vessel had been captured on the high seas, before her arrival in the United States, she would have been taken in delicto, according to any construction by which this section can be applied to foreigners. The legislature might, indeed, intend to confiscate the property of our own citizens, for acts done by them in foreign countries, because their allegiance travels with them wherever they go. But the operation of a statute is generally limited to the territory, or the subjects of the country where it is made.a This section of the act may stand consistently with this construction; but it will be confined in its operation to the conduct of our own citizens. The subsequent coming into the waters of the United States was occasioned by a vis major, and did not constitute an importation in law. To constitute such an importation, there must be a voluntary arrival within a port. An involuntary arrival is not an importation; nor an arrival within the jurisdictional limits merely: there must be a voluntary arrival within some port, or collection district, with intent to unlade.b
 The Attorney-General and Mr. Preble, contra, argued upon the facts that the primary destination was to the United States, and that the distress set up as a plea to justify the fact of importation, was fictitious, or created by the act of the parties themselves.
 Feb. 27th.
 Mr. Justice LIVINGSTON delivered, the opinion of the court, and after stating the case, proceeded as follows:
 
 
 1
 It is not necessary or important, on this occasion, inquire into the national character of the AEolus, or to ascertain in whom the proprietary interest of the cargo resided, at the time of seizure; because, whether Russian, British, or American, they are both equally liable to forfeiture, if the offence stated in the libel has been committed. The cargo, being avowedly of the growth, produce, or manufacture of Great Britain, it is conceded that a forfeiture must follow, if the fact of a voluntary importation into the United States be made out. Yet, in deciding this question, it is impossible to discard entirely from view some of the circumstances which preceded, and took place after the arrival of this vessel at Bass-Harbour, which, although not immediately connected with any calamity which may have brought her there, are not at all calculated to excite much sympathy or to call for any extraordinary exertion of credulity, while listening to the tale of distress, on which every hope of restitution is now rested.
 
 
 2
 Mr. Scholtz, a Russian merchant at Archangel, in time of war between this country and Great Britain, and during the existence of our non-importation act, loads at that place no less than five brigs with the products of Russia, which he commits to the care of Mr. Morgan, a merchant at Liverpool, with instructions, as is said, to invest the proceeds of those cargoes in such British manufactures as he might judge suitable for sale in the Havanna. Mr. Morgan, who, at or about the time of loading these vessels, was at Archangel, proceeds to Liverpool, disposes of the cargoes there, charters the Russian brig AEolus, and despatches her for the Havanna, to the address of certain merchants there, who are informed by a letter from him of the origin of this adventure, and that he has sent to them a cargo, in conformity with the orders of his principal, which he begs them to sell at good, or even saving prices, and after investing the proceeds in certain produce, to load the AEolus and send her to Mr. Scholtz, at Archangel. The instructions of Mr. Scholtz, in an affair of so much magnitude, no where appear in the proceedings; but if they were, in truth, of the kind stated by Mr. Morgan himself, in his letter, which has just been referred to, we shall find there was a total departure from them; for not only was the cargo of the AEolus the most unsuitable which could have been selected for a warm climate; but the Havanna, to which alone, by his own account, he was to send the AEolus, was to be her port of destination only in case she could not enter a port of the United States. When we find so great a departure from instructions as would inevitable fix upon the agent a responsibility to the whole extent of the property committed to his charge, we may well be permitted to doubt of their existence altogether, and to suspect that Mr. Morgan is acting in the character of a principal, and not, as he would have us believe, in that of a humble subordinate agent. This suspicion is not diminished, when we find, that although this suit has been pending between two and three years, Mr. Scholtz has interfered with it neither in person, nor has he thought it worth his while to appoint any agent for that purpose.
 
 
 3
 After the purchase of a cargo principally calculated for a northen market, and worth not less than 104,311 dollars 37 cents, it is committed to a supercargo, to whom no other than verbal instructions are given. This gentleman styles himself a commissioned officer in the imperial navy of Russia; and on his arrival in the United States can speak nothing but broken English. He proves, however, to be a naturalborn citizen of Massachusetts, who had been absent from his country not more than four years, and who, therefore, as may well be supposed, was not long in recovering his vernacular tongue, which we soon find him speaking with as much facility as if he had never been absent from his native state. Mr. Williams, for that is the name of the supercargo, is directed by Mr. Morgan to call off Wiscasset, where he would receive orders from Mr. Wood, who, it seems, although it does not appear how, was fully apprised of the destination of this vessel, and of the time when she would probably be in his neighbourhood. Whence he derived this knowledge, or when, he has not deigned to inform the court, and although claiming so valuable a property for the owners of vessel and cargo, he has shown no authority whatever from either of them for interfering in this way; and when, after a lapse of more than two years and a half from the first institution of proceedings in the district court, interrogatories are addressed to him, for the purpose of discovering who were the real owners of this property, and whether they had appointed him, and when, as their attorney, and some other matters which he alone could have rescued from the mystery in which they are now involved, he produces no authority whatever, and contents himself with informing the commissioners, that being agent of the claimants, he thinks it improper, at that time to answer any interrogatories, and shall, therefore, decline doing so.
 
 
 4
 The AEolus leaves Liverpool without being furnished with a chart of the Havanna, or the coast adjacent, and two days after her departure the master is ordered by the supercargo to proceed off the port of Wiscasset, which was accordingly done, and all idea of going to the Havanna, if any were ever entertained, appears, from that moment, to be abandoned; and she is accordingly found, after a boisterous and long winter's passage, in a high latitude off the American coast. Now, if there be nothing criminal in a vessel coming on our coast, with a bona fide intention of ascertaining whether under existing laws, she would be permitted to an entry; yet, when a vessel is found in this situation, in a boisterous season of the year, and so very much out of the way of the place to which it was pretended she was destined, if our ports were shut, and then relies on the plea of distress for the coming in, a court will require the most satisfactory proof of the necessity which is urged in her defence.
 
 
 5
 To make out this necessity, the principal, if not the only witness produced, are the master and supercargo Out of fifteen persons, these two are selected, and relied on to establish this all-important fact. No survey is had of the vessel or cargo either before or after it was discharged. To these two witnesses, if they stated a sufficient distress, which is not conceded, very serious objections lie. The master is so much implicated in all the transactions of this nature, that it must always be more or less hazardous for a claimant to resort to his testimony, when other and less exceptionable witnesses are at hand. Not only some of the seamen on board might have been examined; but why not call on persons residing at the place where the vessel discharged, to examine her, and to give their testimony. Such persons were at hand, for the master speaks of three ship masters who surveyed her, and gave their opinion. As no survey is produced and neither of these ship masters is a witness, the court can take no notice of any opinion they may have entertained or have given to the master of the AEolus. The testimony of the supercargo on this subject, if it made out an adequate cause for coming in, would have been entitled to more credit if he had behaved throughout this transaction in a manner more consistent than he appears to have done. But independent of this conduct, there are parts of his testimony which it is very difficult to believe, and which throw a shade over the whole. He swears that his instructions for Morgan were not in writing, and that he had never received either from him or Scholtz, any letter concerning his voyage. It is incredible that any man should be entrusted with so large a property, without other than verbal instructions; or, at any rate, it is so entirely out of the common course of business, that the court cannot be blamed for disbelieving it. But there are other circumstances which detract much from the credit of these two witnesses. There is every reason to believe from other evidence in the cause, that when the brig came into Bass-Harbour, neither of them thought of justifying their conduct on the ground of necessity. This suggestion was made to them by Mr. Wood, and not until they had been there a week or longer. This fact is proved in a way to admit of but little doubt of its accuracy; not only by the profound silence which was observed on this subject by the master and others, for some time after the arrival of the brig, but by positive testimony, which establishes that the allegation of distress was a matter of concert between the supercargo of Mr. Wood. It also appears by other witnesses in the cause, that the AEolus, notwithstanding the injuries which she had received, might have proceeded to the West-Indies without any other repairs than such as might have been put on her at sea. Upon the whole, the court is of opinion that the coming in of the AEolus was voluntary, and not produced by any distress which could justify the measure, and that thereupon the sentence of the circuit court must be affirmed with costs.
 
 
 6
 Mr. Justice JOHNSON, dissented.
 
 
 7
 This valuable vessel, with a cargo worth 120,000 dollars, is claimed as Russian property. She was libelled as forfeited under the provision of the non importation act, and all questions respecting proprietary interest I consider irrelevant to the case. The excuse for putting into the port of Bass-Harboun was distress, and, as in the case of the New-York,c the minority of the court are of opinion, that she ought to have been permitted to store her cargo, repair, re-ship it, and depart. Such evidently was the policy of the law under which she was seized, which had for its object the exclusion of British goods; whereas this seizure legalized their introduction into the country.
 
 
 8
 It is urged in this case, that a variety of circumstances indicated a fraudulent intention. That the examination of the witnesses exhibits a melancholy view of depravity of morals, I freely admit, but the observation is fully as applicable to the testimony for the prosecution, as that against it.
 
 
 9
 The two principal circumstances relied on as indicia of fraud, to wit, her clearing out for Havanna, and her having a cargo adapted to a northern market, admit of an explanation perfectly consistent with innocence: For it is well known that a neutral never clears out from a British port to a port of their enemy; and as to her having a cargo adapted to a northern market, it is precisely what she avows, that her intention was to deposite it in that market had the prohibition been taken off on her arrival.
 
 
 10
 Under these circumstances, it appears to me that the only question in the case was, whether the distress was accidental or factitious. If there had been any fraudulent means made use of to produce the injury sustained condemnation ought to follow. But if produced by causes not within the control of man, even though the distress may not have been deemed sufficient to entitle the party to a permit to unlade and refit, yet it was no sufficient cause for condemnation, and the vessel should have been ordered off. That the distress in this case was not factitious, nor very inconsiderable, there is every reason to believe. The vessel had had a voyage of seventy-five days, nearly double what might reasonably have been provided, for she had shipped a sea which carried away her railings, and washed overboard one of her passengers; her shrouds and bow-sprit were materially damaged, and her water short. Under these circumstances, I must think that this collector was less under the influence of humanity and a sense of duty, than that of avarice, in making this seizure. Had he libelled her as enemy's property, I should have thought the case not destitute of reasonable grounds; but it was not his interest to convert her into a droit of admiralty, and it is not our province, under this libel, to admit any thing into the case which can bear the appearance of charging with one crime, and trying for another.
 
 
 11
 Decree affirmed.
 
 
 
 a
 Caseregis, Disc. 130. § 14-22.
 
 
 b
 Reeves' Law of Shipping, 203-207. The Eleanor, 1 Ed. wards, 161, The Paisley, Id. App. 17. The Mary, 1 Galliss 206. The United States v. Arnold, Id. 358. S. C. 9 Cranch' 204. The Blaireau, 4 Cranch, 355. note. The Fanny, 9 Cranch, 181.
 
 
 c
 Vide ante, p. 59.